AO 91 (Rev. 11/11) Criminal Complaint

AUSA Paul H. Tzur (312) 697-4032
AUSA Allison A. Ray (312) 353-6117

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**✒FILED**

JUL 2 9 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

JUAN MANUEL SANCHEZ-JARA

CASE NUMBER:

# 15CR 457

MAGISTRATE JUDGE SCHENKIER

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 27, 2015, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

KRYSTAL N. WILLIAMS
Special Agent,
Homeland Security Investigations

Sworn to before me and signed in my presence.

Date: July 29, 2015

City and state: Chicago, Illinois

Judge's signature

SIDNEY I. SCHENKIER, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## AFFIDAVIT

I, Krystal N. Williams, being duly sworn, state as follows:

1.    I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"). I have been so employed since approximately October 2009. As part of my duties, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws. I have also participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws.

2.    This affidavit is submitted in support of a criminal complaint alleging that JUAN MANUEL SANCHEZ-JARA has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging

SANCHEZ-JARA with possession with intent to distribute a controlled substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on my personal knowledge, my training and experience, information provided to me by other law enforcement officers, statements by SANCHEZ-JARA, and surveillance.

### Facts Supporting Probable Cause

4.      There is probable cause to believe that on or about July 27, 2015, SANCHEZ-JARA knowingly and intentionally possessed with intent to distribute 5 kilograms or more of cocaine. As discussed below, on or about July 27, 2015, law enforcement officers approached and talked with SANCHEZ-JARA outside of the single-family residence where he lived located at 3606 W. 81st Street in Chicago (the "W. 81st Street Residence"). SANCHEZ-JARA and the other occupant of the W. 81st Street Residence provided written consent for law enforcement officers to search the W. 81st Street Residence. During the search, law enforcement officers found approximately nine kilograms of cocaine and two firearms in a safe in the basement of the W. 81st Street Residence, which safe SANCHEZ-JARA gave the law enforcement officers consent to search and also provided the access code. Also as discussed below, law enforcement officers subsequently found an additional approximately 90 kilograms of cocaine in the bed of a pickup truck parked in the garage of the W. 81st Street Residence.

*Background and Information Obtained Leading to the Search*

5.    As part of an ongoing narcotics investigation, on July 24, 2015, the United States District Court for the Northern District of Illinois entered an order authorizing, among other items, the collection of real-time location information for a cellular telephone with number (708) 261–2832 ("Sanchez-Jara Phone 1") as well as the use of a pen register, in the form of electronic investigative techniques, to locate Sanchez-Jara Phone 1.

6.    In the morning on or about July 27, 2015, real-time location information from Sanchez-Jara Phone 1 showed that the phone was located in the vicinity of the W. 81st Street Residence. Based on this location information and other information obtained by law enforcement officers during the course of this investigation, law enforcement officers conducting surveillance ("surveillance") established positions at a number of locations in the vicinity of the W. 81st Street Residence, including near the W. 81st Street Residence. At approximately 7:55 a.m., law enforcement officers used electronic investigative techniques that showed that Sanchez-Jara Phone 1 was located within the W. 81st Street Residence.

*Surveillance and the Search*

7.    On or about July 27, 2015, at approximately 12:46 p.m., Chicago Police Department officers conducted a traffic stop of a green Ford Freestyle sedan bearing Illinois license plate V569475 (the "green Ford Freestyle"). The driver identified himself as SANCHEZ-JARA but was not in possession of a valid driver's license. The vehicle also contained a passenger, who was identified as Individual A.

8.   Surveillance then observed the following:

   a.   At approximately 1:45 p.m., the green Ford Freestyle entered the parking lot of a restaurant located at 8201 S. Pulaski Avenue in Chicago (the "Pulaski restaurant").

   b.   At approximately 2:25 p.m., a green Honda Element sport utility vehicle bearing Illinois license plate V569450 (the "green Honda Element") arrived in the alley located behind the W. 81st Street Residence. There, SANCHEZ-JARA exited the passenger side of the vehicle and entered the residence's yard.

   c.   At approximately 3:45 p.m., SANCHEZ JARA entered the alley behind the W. 81st Street Residence through the yard and walked towards the green Honda Element.

9.   At approximately 3:47 p.m., law enforcement officers approached the green Honda Element, which was still parked in the alley behind the W. 81st Street Residence. At that time, the law enforcement officers observed SANCHEZ-JARA in the passenger seat of the green Honda Element and Individual A in the driver's seat. The law enforcement officers identified themselves as such and asked Individual A to turn off the vehicle's engine. SANCHEZ-JARA and Individual A were both asked to step out of the vehicle. At that time, neither SANCHEZ-JARA nor Individual A was placed in handcuffs or was otherwise under arrest.

10.   Law enforcement officers asked SANCHEZ-JARA whether he had any immigration issues on any previous occasions. At first, SANCHEZ-JARA said that he did not, but after additional questioning by the law enforcement officers, he

stated that he was arrested and deported approximately eight years ago while in St. George, Nevada. SANCHEZ-JARA also stated that he had re-entered the United States illegally and was presently in the United States without proper authorization.

11. At around that time, SANCHEZ-JARA also told the law enforcement officers that the green Honda Element was not his and that he did not reside at the W. 81st Street Residence. The law enforcement officers asked SANCHEZ-JARA if they could step inside of the residence and talk more due to the hot weather and because the law enforcement officers did not want to draw unwanted attention from the neighbors. SANCHEZ-JARA responded that he did not have keys to the W. 81st Street Residence. SANCHEZ-JARA also stated that a friend of his, Individual B, resided at and held the keys to the residence. SANCHEZ-JARA then offered to go to the Pulaski restaurant, where Individual B worked. At that time, a group of law enforcement officers departed from the W. 81st Street Residence to the Pulaski restaurant to speak with Individual B about consent to search the W. 81st Street Residence. Through this conversation, neither SANCHEZ-JARA nor Individual A was placed in handcuffs or was otherwise under arrest.

12. At approximately 4:10 p.m., law enforcement officers arrived at the Pulaski restaurant and spoke with Individual B. Individual B subsequently confirmed that he resided at the W. 81st Street Residence and provided law enforcement officers with written consent to search the W. 81st Street Residence. At approximately 4:30 p.m., law enforcement officers and Individual B returned to the

W. 81st Street Residence. Pursuant to the written consent provided by Individual B, three law enforcement officers initially entered the residence and conducted a protective sweep of both floors for officer safety purposes. When it was determined that no other persons were inside the residence, additional law enforcement officers entered the W. 81st Street Residence and conducted a search.

13.    At approximately the time that law enforcement officers began to search the W. 81st Street Residence, the law enforcement officers who had remained with SANCHEZ-JARA and Individual A informed SANCHEZ-JARA that Individual B had provided consent to enter and search the residence. SANCHEZ-JARA was then asked to enter the residence with the law enforcement officers, which he agreed to do.

14.    SANCHEZ-JARA and the law enforcement officers with him then entered the W. 81st Street Residence and walked into the residence's basement. There, in plain view, was a safe approximately 5'8" in height. SANCHEZ-JARA then told the law enforcement officers with him that the safe was his. At that time, SANCHEZ-JARA also admitted that he, too, resided in the W. 81st Street Residence. Law enforcement officers asked SANCHEZ-JARA for consent to look inside the safe. SANCHEZ-JARA said that the officers could and provided the combination for the safe. At approximately that time, SANCHEZ-JARA also signed a written consent form consenting to the searches of the W. 81st Street Residence, the safe, and five cellular telephones.

15. Also at approximately that time, law enforcement officers asked SANCHEZ-JARA what was located in the safe. SANCHEZ-JARA hesitated at first but then stated "cocaine." SANCHEZ-JARA was asked how much cocaine was located in the safe, and SANCHEZ-JARA responded with words to the effect of "nine to ten," which law enforcement officers understood to mean nine to ten kilograms. SANCHEZ-JARA was also asked at that time for consent to search the garage at the W. 81st Street Residence, and SANCHEZ-JARA granted consent, again on a written consent form.

16. Law enforcement officers then opened and searched the safe. Inside the safe, law enforcement officers found a large, black, plastic garbage bag in which law enforcement officers found nine individually wrapped, brick-shaped packages. One of the packages was cut open and contained a white, powdery substance. Law enforcement officers subsequently field-tested the contents of the package, which tested positive for cocaine. The total weight of the substances and their packaging was approximately 10.4 kilograms. The substances and packages have been submitted to the laboratory for further analysis.

17. Also in the safe, law enforcement officers found two firearms. Specifically, on the floor of the safe next to the bag containing the cocaine, law enforcement officers found a Lorcin .380-caliber (9mm) pistol with the serial number scratched off and a magazine containing ammunition. Additionally, law enforcement officers found a smaller lock box located on one of the shelves of the safe. SANCHEZ-JARA provided the key to this lock box. Law enforcement officers

opened this lock box and inside found a Hi Point, 9mm pistol with a loaded magazine but no bullet in chamber. Also in the lock box, law enforcement officers found a key to a Nissan vehicle. Additionally, in the top left drawer of black dresser in basement bedroom, law enforcement officers found a Smith and Wesson pistol, model 5946, bearing serial number VJP4390 and a magazine containing ammunition.

18.     SANCHEZ-JARA was then asked if more cocaine was located in the garage. At first, SANCHEZ-JARA did not answer, but when asked again, SANCHEZ-JARA said that there was more cocaine in the garage. When asked, SANCHEZ-JARA also said that, in total, the house contained approximately 100 kilograms of cocaine. Law enforcement then read SANCHEZ-JARA his *Miranda* rights in Spanish. SANCHEZ-JARA said that he understood his rights and agreed to waive them. SANCHEZ-JARA also signed a *Miranda* waiver form written in Spanish. SANCHEZ-JARA subsequently told the law enforcement officers the following:

a.     Approximately two or three days earlier, SANCHEZ-JARA traveled to a location (SANCHEZ-JARA said that he could not recall where) by himself in a blue Nissan Frontier pickup truck (the "blue Nissan Frontier") he owns and met with an unknown male individual (the "UM").[1] There, SANCHEZ-JARA provided the blue Nissan Frontier to the UM. SANCHEZ-JARA went for a walk

---

[1]     SANCHEZ-JARA said that he had never seen the UM prior to this meeting and has not seen him since. SANCHEZ-JARA said that he could not provide a telephone number for the UM and could not say how he was placed in contact with the UM or by whom. SANCHEZ-JARA was not willing to provide a description of the UM.

while the UM took the vehicle to another unknown location and loaded the vehicle with the three rolling suitcases that contained a total of 99 kilograms of cocaine. SANCHEZ-JARA knew the contents of the packages in the rolling suitcases to be cocaine prior to receiving the packages.

b.     SANCHEZ-JARA returned to the garage of the W. 81st Street Residence where he removed nine to ten kilograms from one of the rolling suitcase because they were loose. He placed those kilograms into the large safe that was in the basement of the house.

c.     SANCHEZ-JARA was responsible for selling the cocaine and then returning the proceeds from the sale of the cocaine to another unknown male individual by unknown mean or method.

d.     Regarding the firearms, SANCHEZ-JARA believed that three handguns were located within the large safe. SANCHEZ JARA purchased all three handguns from two separate vendors approximately three years prior. SANCHEZ-JARA could not recall the make and model of each handgun but stated that he paid $300, $350, and $400, respectively, for each firearm. Two of the firearms were purchased form one private seller and the other from a separate private seller. SANCHEZ-JARA could not provide the name of either seller but did say that he knew that one had returned to Mexico.

19.     Separately, law enforcement officers searched the garage at the W. 81st Street Residence. Law enforcement officers entered the garage and found two vehicles: a blue Nissan Frontier sport utility vehicle bearing Illinois license

plate 35940UB Truck, and a black Jeep bearing Illinois license plate V569456. The Nissan Frontier had a locked cover over the bed of the truck. SANCHEZ-JARA told law enforcement officers that they could use the key found in the lock box in the safe to unlock the Nissan Frontier. Using the key, law enforcement officers unlocked the tailgate and lifted the cover off of the truck bed. Inside the truck bed, law enforcement officers found a large red suitcase, a medium black suitcase, and a medium red suitcase. Law enforcement officers opened one of the suitcases and discovered that it was filled with mylar-wrapped, brick-shaped packages. The remaining two suitcases were subsequently opened and found to contain similar packages. In total, approximately 90 mylar-wrapped packages were located in the three suitcases. Law enforcement officers subsequently field-tested the contents of one of these packages, which field-tested positive for cocaine. The total weight of the substances and their packaging was approximately 102.6 kilograms. The substances and packages have been submitted to the laboratory for further analysis.

## Conclusion

20.    Based on my personal knowledge, my training and experience, information provided to me by other law enforcement officers, statements by SANCHEZ-JARA, and surveillance as described above, there is probable cause to believe that on or about July 27, 2015, SANCHEZ-JARA knowingly and intentionally possessed with intent to distribute 5 kilograms or more of cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

KRYSTAL N. WILLIAMS
Special Agent,
Homeland Security Investigations

SUBSCRIBED AND SWORN to before me on July 29, 2015.

SIDNEY I. SCHENKIER
United States Magistrate Judge

11